JEFF NESBIT *et al.,* plaintiffs in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. The plaintiffs in error were indicted for murder and convicted, and a motion for a new trial was overruled by the Court:

*Held,* That the practice of trying the competency of jurors by the Court, under the law, now is, after the juror has satisfactorily answered the statutory questions and is pronounced competent, the party putting such juror upon trial must produce evidence of the untruthfulness of his answers, and, after the introduction of such testimony, it is within the province of the Court to hear the juror or examine him as to his explanation in the premises. The object of the law is to procure fair and impartial jurors, and, while the formation or expression of an opinion upon mere rumor will not necessarily disqualify a juror, yet the character of the expression, the sources of information and the circumstances under which it has been used, are matters for the Court to consider, in ascertaining the existence of bias or prejudice.

Nesbit *et al. vs.* The State of Georgia.

2. While we recognize the rule governing the admission of dying declarations, as laid down in the Code, section 3728, yet contiguity to death and the fixed opinion of the deceased that he would die, coupled with the fact of his being then dying, from compression of the brain, notwithstanding the physician's opinion, constituted such a condition as rendered the evidence admissible, subject to the charge of the Court.

3. And we hold that the character of the deceased for wickedness, and his disregard of the laws of God, are to be considered by the jury; for though a man may have lost hope of this world, yet if he has no belief in God, or in divine revelation, while his declarations are admissible, their weight and consideration is for the jury.

4. *Held again*, That the verdict of murder in this case is not sustained by the evidence.

Criminal law. Jurors. Dying declarations. New Trial. Practice. Before JUDGE CLARK. Baker Superior Court. April Term, 1871.

Jeff Nesbit and George Johnson were indicted for murdering John Jordan, with a hoe, in said county, in April, 1870. All the parties were negroes. While empannelling the jury, one Williams, after answering the statutory questions on his *voir dire*, was put upon the prisoners. Their counsel asked that he be put upon the Court as trior. This was allowed, but when they proposed to ask Williams whether he had formed and expressed an opinion from rumor, the Court refused to allow the question to be asked.

Pending the trial, prisoner's counsel moved to reject the sayings of Jordan, deceased, which appear in the evidence below, because there was no sufficient basis laid for using them as his dying declarations, but the Court overruled the motion.

The evidence on the trial was as follows:

H. H. HALL, sworn: That he knows the defendants and deceased; all the parties were living four miles west of this place, on T. Nesbit's place; witness had charge of the place; John Jordan, deceased, was foreman of all the hands; the defendants were under him; difficulty occurred the 12th of April, 1870, at about seven o'clock in the morning, in Baker

county; heard of difficulty about eight that morning; deceased sent for him; he (Jordan) was not where the difficulty occurred, but about four hundred yards from the place; deceased was suffering a great deal; right eye swollen and closed; he was in buggy, coming to the house; he said "Mr. Hall, let us go back to the house;" deceased said no more until he got on bed; deceased seemed in great agony; said nothing to him till just before doctor came; deceased said that he would die, several times; said that his skull was broken; tried to reassure him that blow was not serious, and tried to buoy him up; deceased repeated, after doctor examined him and my conversation with him, that he would die; told me these statements about nine o'clock in the morning, and the last time I saw him was ten, when I left; died on the 13th, about twelve o'clock, A. M.; had been there at eight that morning; he was dying and insensible; said that he never had such a rack of misery in his head before; not conscious between twelve and time he died.

*Cross-Examined by Prisoners:* Saw deceased about seven o'clock, on the morning of the 13th; knows nothing of his condition from the time he saw him on the 12th until the morning of the 13th.

*Statements of Deceased:* Said he had the hands divided that morning; had portion of them plowing, the rest replanting corn; went by the plows that morning; remained at plows awhile, then went to where the hands were planting; found prisoners idling; commenced ripping at them, and they commenced quarreling with him; about that time deceased picked up his hoe to go across their rows to get to his; George said, "Uncle Jordan, don't hit me with that hoe;" deceased said, "Go to your work, I'm not going to pester you;" about that time they got into a general fuss; George struck at deceased with his hoe; he defended off the blow with his own hoe; Jeff struck him on the head with his hoe, knocking him senseless; deceased said nothing about his having struck at prisoner; this occurred on Nesbit's place,

Nesbit *et al. vs.* The State of Georgia.

in the field; known deceased ten years; he was peaceable; never put me to any trouble.

*Cross-Examined by Prisoners:* Conversation stated in chief examination occurred with deceased about ten o'clock on the morning of the 12th; did not say he cursed prisoners; was a cursing negro; deceased said he ripped at them, afterwards picked up his hoe to go across their rows to get to his row; George said don't hit me with that hoe, Uncle Jordan; said if prisoners struck him more than once he did not know it; Jeff struck him; know nothing against Jordan; knew nothing of his disposition to grumble; he would press hands; knew deceased to be a quiet, peaceable negro with me; know nothing of his conduct to others.

DR. JAMES A. FOGLE sworn: I am a professional man, am a physician; knew John Jordan and prisoners; visited Jordan on the 12th, between nine and ten o'clock; saw contused wound on the head, complained of pain there; was rational but slightly comotose at the time, but slight excitement of the pulse, skin moist, and deviating but little from the natural condition; remained with him but a few minutes; had conversation enough to know that he was rational; saw him on the 14th, at post mortem examination; discovered a depressed fracture in the skull, between frontal and parietal bones; wound inflicted by some dull, heavy instrument; it was mortal, judging from its appearance; sufficient to cause death by congestion and depression; he died from the effect of said wound inflicted on his head.

*Cross-Examined:* Examined the extent of the wound, could not raise it, from reason of its recency; he was not in a dying condition; never saw him but once; chances for his recovery decidedly in his favor when I first saw him; as a general thing contused wounds are favorable; saw clotted blood about the wound; bone pressing on the brain produces comotose state; could not tell whether it could have been raised or not; did not think that he was going to die, and told him so; depression and fracture sufficient to produce death.

Nesbit *et al. vs.* The State of Georgia.

JOHN NEIL, (colored) sworn: Know the parties; live on Nesbit's place, where they do work ; remembers where difficulty took place in field ; heard George say on Monday— me and him were in dispute—he said that some of the head men would get the —— knocked out of them ; did not go with old man Jordan to the house ; Ben did ; was at house when deceased was put to bed ; became insensible between ten and eleven the day he was wounded ; was there until about two o'clock ; was not there when he died ; was an hour and half after he died ; never went back that night; was insensible at two o'clock ; he was out of bed, his wife got me to put him back ; called him and he did not answer ; called him at night and he did not notice me or answer me, or talk to any one ; he could move about.

*Cross-Examined:* All the reason I had for believing he was out of his head, he would not speak to me ; he rolled about in bed and would not answer me ; was not there when doctor came, nor while he was there ; doctor came after I had carried him into the house; saw him shortly after doctor left ; was not sensible a short time after doctor left ; spoke to him in the morning before doctor came, not after he left.

JEFF NESBIT, one of the defendants, sworn for the other, says Jordan told witness and Charles that he wanted us to go to replanting corn. Charles took bag on his mule and went on to the field. Uncle Jordan went by the plow-hands. We went to field; met Charles coming back with mule, and we went on to bag corn; took three ears each and shelled it. Went off from bag and heard some one coming behind ; looked back and saw uncle Jordan coming before and Charles behind. Uncle Jordan was cursing witness and George for everything he could think of. We went on from there to where we had to replant corn, got there and we were about midway of the field. Met uncle Jordan still cursing. George said, uncle Jordan, you ought not to curse us that way, we have not done nothing to you. He replied, By God, if you don't like it, don't take it. George said, "Seems more like

Nesbit *et al. vs.* The State of Georgia.

you don't like it any more than we do." When he said that, he (Jordan) picked up his hoe and walked off from his row and said, "God damn you, just repeat them words again." George then said nothing. Jordan came across to where George was, pulled out his knife and said, "Charles, by God, go home and get my gun." Charles said, "No, uncle Jordan, I don't want anything to do with it." Mary was coming to us. Jordan said, "Mary, honey, go home and get my gun." He was Mary's uncle. Said to witness he was going to kill them two d—n sons of b—hes, Mr. White-head would pay his way out. Mary was going on through field pretty slow, and Jordan said, "If you don't go on faster I will give you hell, Mary, and as you go on for my gun, go by John's and tell him to come down here and back me, I fotch him here for that purpose." He said to Charles, "Come here and take one of these d—n sons of b—hes." Charles said, "Uncle Jordan, I don't want anything to do with it." He came though. Charles said, "Boys, you know uncle Jordan will curse, go on to your corn." We started. Jordan said we should not plant another hill. George said, "We can go home then." Jordan said, "God damn you, go." We started home; he (Jordan) followed, cursing us, and had his hoe. We walked pretty pert and got him a good distance behind us. He caught up with us and struck George, and he struck Jordan back.

*Cross-Examined:* We were shelling corn by bag, which was not half way in the middle of the field of one hundred acres, but good piece from fence; Jordan was about two hundred yards off when I heard him; left bag and went off down to the other end of the field; old man Jordan went to the bag, picked up two ears and come on back; when we got out of the rows, we turned round and came back; had our hoes; first talk occurred near the middle of the field; were replanting with our hoes; never stopped planting corn, but kept on; last talk we had was at end of row; put hoes down at house; kept our hoes in our hands all the time after we

left bag, until we got to the house; Charles had passed when we had the first talk; he had been there; Charles was about as far as across the Court-house when licks were struck; had gone about one hundred yards from planting; did not tell Mary what he wanted with the gun; struck George across the head; it was a pretty loud lick; George struck him back; hit him with eye of the hoe; did not hit George with both hands; had hoes in hand with eyes on the ground; he hit old man on his head; he was the man that struck the blow; never hit him but one blow; we went off and left him lying there.

*Re-Examined:* Old man fell when George struck him; don't know which lick knocked him down; we both struck him at the same time.

CHARLES NESBIT sworn: Tuesday morning uncle Jordan told witness to go to the field with a bag of corn and replant; sun was right smart high, about half hour; when witness got near bag corn in the field, he saw George and Jeff leaving it with corn; had their hoes; uncle Jordan commenced cursing the boys for not getting to their work time enough; boys were ahead of witness and Jordan; took their rows and were going on ahead of us; got there and were replanting corn; when we got up there, uncle Jordan commenced cursing them again, and left his work and went over to them, carrying his hoe; they were all standing together; Jordan called on witness to go to the house and get his gun to keep prisoners off him; they were standing quarreling; were not doing anything; witness refused to have anything to do with it; Jeff was doing nothing but quarreling, but Jordan called upon me to take hold of Jeff; after a while I went up to where they. were standing and said, "George, come let's go to replanting corn, you know uncle Jordan will cuss and been cussing;" then George said, "Jeff, come on, let's go," and wheeled off; uncle Jordan said, "No, God damn you, you shan't plant another hill; go to the house;" when uncle Jordan said that, the boys started off to the

house. I turned my back and went to work; uncle Jordan followed prisoners, cursing them; his cursing did not surprise me; I was used to it; went on to my work; after awhile I heard two licks pass; saw uncle Jordan throw his hands to his face; heard George say, "Uncle Jordan, you struck me first lick?" George was standing on the right hand and Jeff on the left hand of Jordan; immediately after I heard the two blows, I looked around and saw uncle Jordan down in a squatting position; Jordan had his hoe; he had followed prisoners from where they were at work towards the house, about as far as from here to Mr. Scollay's store. George and Jeff shouldered their hoes and went on to the house; witness carried corn in ear to the field before the difficulty; no one went with him; witness then took mule back to the plow and met prisoners in the field, about two hundred yards from the bag; it was about four hundred yards from where witness met prisoners to where he had to carry the mule to the plow; he hitched the mule to a snag and went back to the bag; the corn had to be shelled; prisoners had no more than time to shell their corn, before I got within fifty yards of the bag; witness went first and Jordan afterwards; Jordan had been in cotton field; had not been in corn field before that morning; there is a cross fence between the two fields; the prisoners were going down one row, and witness and Jordan were coming down behind them; they got their row and turned back and met Jordan, where he went over to them; it was not necessary for Jordan to go over prisoners' row to get to his work.

*Cross-Examined:* Have known uncle Jordan eleven years; he was foreman of the place; was quick-tempered; we knew he was foreman; cursed a great deal; hands knew it was his custom to quarrel a good deal; the prisoners kept up the quarrel; did not understand what the prisoners were saying; understood uncle Jordan to say that they should not plant any more corn. Jordan never told witness but once to keep prisoners off of him; never heard uncle Jordan say to Mary

to get his gun, but saw her going across the field; witness saw Jordan when he went across to prisoners; never saw an attempt to strike either of prisoners with his hoe; saw Jeff and George, plainly, when they turned off to go to their work from Jordan; they had their hoes and handles, and in perfect order—neither of them broken. Jordan was following on, cursing; witness heard but two licks; could have heard a third stroke; heard them plainly and distinctly; witness turned at once when he heard the blows; saw Jordan; is certain he saw Jordan throw his right hand to his face; saw Jordan's hoe in his left hand, the eye of the hoe on the ground; witness saw Jeff's hoe then; it was broken off about one foot from the eye of the hoe, the piece lying off on one side of Jordan. Jeff went off to the house with the helve, and left the eye lying there.

*Rebuttal:* Jordan was very mad at that time.

GEORGE JOHNSON, the other defendant, sworn, says: We went out on Tuesday morning, by direction of uncle Jordan, to replant corn; got to where bag of corn was, shelled it and put it in our pockets; when we got out of end of the row and were returning, uncle Jordan met us; he was still cursing. We had not said anything; uncle Jordan said, " You are a d—d dog." Jeff said, " I'm not saying anything to you, uncle Jordan;" uncle Jordan said, " If you don't like it, don't take it;" Jeff said, " It seems that you don't like it any more than we do." At the time uncle Jordan called Jeff a " d—d dog." Jordan was crossing from his row to us; when Jordan got to me and Jeff, he drew his hoe; when he did this, Jeff said, " Uncle Jordan, don't strike me, I have not done nothing to you;" said to Charles, " Go home and get my gun, to keep these d—d sons of b—hes off of me." Charles said, no, he did not want anything to do with it. Jordan then said to Charles, " Come and take hold of one of these sons of b—hes." Charles refused. Jordan then said, " Come and take hold of one of these, while I give the other h—l." Jordan said, " I bought my powder and shot; when

my gun comes, I'll fix you two d—d sons of b—hes; I'll shoot these two d—d sons of b—hes, and Mr. Whitehead will pay my way out;" Charles said, "Boys, let's go on to work; you know uncle Jordan will cuss;" Jordan said, "No, G—d d—n you, you shan't go to the house." Jeff said, "You have cussed me for all the d—d sons of b—hes this morning, and I have said nothing to you;" and then Jordan called Mary and said, "Honey, go home and get my gun." Charles was a good piece off, when Jordan called Mary to get his gun, replanting corn; Jeff said, "George, if we can't replant corn, we can go back to the house;" we started to the house, and uncle Jordan followed us, with his hoe on his shoulder; did not have to go by Charles to go to the house; he was going one way and we another; suppose we had walked about two hundred and fifty yards towards the house from where we started; uncle Jordan followed after, cursing. Jeff said, "Well, uncle Jordan, you have been cursing us all the morning and we have said nothing;" uncle Jordan said, "Just say them words again if you dare;" when the words were repeated, Jordan struck Jeff, and me too; then we both struck him, and he went down, like on his knees; when Jordan fell, Jeff said, "Well, you struck me the first lick;" struck me first and Jeff afterwards; we turned off and went to the house.   Jeff broke his hoe.

*Cross-Examined:* Jordan hit witness and Jeff on their heads; did not see where Jeff struck Jordan; both struck at the same time; was certain that Jordan had his hoe drawn on us when he came across to us; Jordan passed prisoners on the way to the house, whirled around, faced them, and struck them both; they were face to face when prisoners struck Jordan; prisoners were between Jordan and Charles when the blows were striken with their backs to Charles.

The jury found the defendants guilty, with a recommendation to mercy.   Their counsel moved for a new trial upon the grounds, the Court erred:   1st. In refusing to allow said question to be asked of Williams.  2d. In not rejecting the

said dying declarations of deceased, and, 3d, because the verdict was contrary to law and strongly and decidedly against the weight of the evidence.

The Court refused a new trial, and that is assigned as error on said grounds.

(The original bill of exceptions and record were stated here by counsel to have been started in time for this Court, and lost *en route*, and failed to reach here by return day for this term. Thereupon an agreed copy was substituted, and the case was allowed to be entered on the docket of this term.)

T. R. LYONS, CAPERS KING, by R. F. LYON, for plaintiffs in error.

R. H. WHITELY, Solicitor General, by R. SIMS, for the State.

LOCHRANE, Chief Justice.

The plaintiffs in error were indicted for the crime of murder and found guilty. A motion was made for a new trial upon several grounds, which were overruled by the Court, and the case comes before this Court for error alleged upon that judgment.

1. The first question made in relation to the refusal of the Court below to allow certain questions to be put to the juror, who was before the Court on trial as to his competency. This question is an important one as to the practice of the Courts in this State, and we will briefly advert to the rule of law governing such cases. Under the present law we hold that, after the juror has answered the statutory questions satisfactorily, and has been pronounced competent, and the parties put him before the Court as trior, primary evidence of the untruthfulness of his answers must be offered, and that it is not competent or legal to propound questions to the juror himself to show his incompetency. But after the introduction of such testimony, it is within the province of the Court to hear the juror or examine him as to his

Nesbit *et al. vs.* The State of Georgia.

explanations in the premises. The object of the law is to procure fair and impartial men, and while the formation or expression of an opinion upon mere rumor is not sufficient to disqualify a juror, yet much depends upon the opinion of the Court, under all the circumstances in evidence, to see whether he has bias or prejudice. It is not the amount, but the existence of the sentiment that should control the judgment, for the law of Georgia provides for perfectly impartial men to discharge the duty of jurors. The judgment of the Court on this subject is seldom reversed, and therefore the conscious responsibility of the judgment should weigh in the consideration of the Court. In the case before us we think there was no error in the view he took of the law upon this subject.

2. The second exception is in relation to the admission of dying declarations, under the Code, section 3728. We have examined the evidence touching the condition of the deceased at the time the declarations were made, and while we recognize the rule laid down by several authors, as to what the condition must be : 1 Phil. Ev., 289 ; Wharton, 31 ; 11th Ga., 353, and in Roscoe's Cr. Ev., etc., still we apprehend the contiguity to death, and the fixed opinion of the deceased that he would die, and his being, in fact, dying from the effect of compression of the brain, constituted such a condition as would have properly admitted the testimony, subject to the charge of the Court applicable to it.

3. The peculiar character of the deceased for wickedness and disregard of the law of God in his outpourings of blasphemy, would have invoked the consideration of the jury; for if a man, even without hope of life in this world, nevertheless without belief in God or in the divine revelation, while his declarations would be admissible, their weight and consideration should be weighed by the jury.

4. In this case we will not travel over the field of evidence before us; it is unnecessary. From its consideration, we are overwhelmingly satisfied that the verdict for murder

is not supported by the testimony. And we think the Court erred in not granting a new trial on this ground.

Judgment reversed upon the ground the Court erred in overruling the motion for a new trial in this case upon the ground that the verdict was contrary to the testimony.